**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EDWARD LEE JONES, JR.,
*Plaintiff-Appellant*,

v.

S. SLADE, South Unit Property
Officer COII #1777 at Arizona
Department of Corrections; D.
MILLER, Employee of Office of
Publication Review at Arizona
Department of Corrections Central
Office; DAVID SHINN, Director,
*Defendants-Appellees*,

and

CHARLES L. RYAN; CARSON
MCWILLIAMS; J. GUZMAN; LORI
STICKLEY,
*Defendants*.

No. 20-15642

D.C. No.
2:18-cv-02034-
MTL-JZB

OPINION

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted August 31, 2021
San Francisco, California

Filed January 24, 2022

Before:  Johnnie B. Rawlinson and Jay S. Bybee, Circuit
Judges, and Kathleen Cardone,[*] District Judge.

Opinion by Judge Bybee

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed the district court's summary judgment
for prison officials in an action alleging that the confiscation
of plaintiff's mail violated his rights under the Free Speech
and Free Exercise Clauses of the First Amendment and the
Religious Land Use and Institutionalized Persons Act.

Plaintiff, Edward Lee Jones, Jr., is incarcerated at the
Arizona State Prison Complex.  In late 2017 and early 2018,
Jones ordered by mail six hip-hop, R&B CDs and two Nation
of Islam texts.  All of the items were confiscated as
contraband pursuant to an Arizona Department of Corrections
(ADC) Department Order 914 ("DO 914"), which regulates
the content of incoming mail.

---

[*] The Honorable Kathleen Cardone, United States District Judge for
the Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel held that genuine issues of material fact existed both as to whether the ADC applied its order inconsistently as to the CDs, in violation of Jones's free-speech rights, and whether the exclusion of Jones's Nation of Islam texts substantially burdened his religious exercise in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause. Addressing first the claims pertaining to the confiscation of the CDs, the panel held that, viewing the evidence in the light most favorable to Jones, there was a material question of fact here—whether ADC selectively enforces DO 914 against disfavored expression, rap and R&B musical genres. Jones had proffered sufficient evidence of inconsistent application of DO 914 to preclude summary judgment. Because a genuine issue of fact existed as to whether there was a valid, rational connection between DO 914, as applied to Jones, and ADC's legitimate interests in security, rehabilitation, and reducing sexual harassment, the panel determined that it need not address the remaining factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987). The panel reversed the grant of summary judgment with respect to the CDs ADC withheld from Jones and remanded for further proceedings, expressing no views on the merits of Jones's claims.

Addressing the claims relating to the confiscation of two religious texts, the panel determined that the district court characterized Jones's religious exercise too broadly as observing Ramadan rather than reading Nation of Islam texts during Ramadan. Having defined the scope of Jones's religious exercise—reading his Nation of Islam texts during Ramadan—the panel next held that there was a genuine issue of fact as to whether denying Jones essential religious texts during Ramadan was a substantial burden on his religious exercise. Accordingly, summary judgment was inappropriate

on Jones's RLUIPA claim. The panel left it to the district court on remand to assess whether ADC could demonstrate that applying the challenged regulation to Jones served a compelling interest and met the exceptionally demanding least-restrictive-means standard.

The panel further held that for the same reasons that the district court's analysis was flawed under RLUIPA, it did not hold up under the Free Exercise Clause. Thus, it was impermissible for the district court to focus on whether reading Elijah Muhammad's texts was required to observe Ramadan, rather than whether Jones sincerely believes reading these texts during Ramadan was consistent with his faith. Because the district court did not reach the *Turner* analysis, the panel left it to the district court on remand to determine whether DO 914 was rationally related to a legitimate penological interest.

---

**COUNSEL**

J. Matthew Rice (argued) and Ryan L. Giles, Williams & Connolly LLP, Washington, D.C.; Easha Anand, Roderick & Solange MacArthur Justice Center, San Francisco, California; for Plaintiff-Appellant.

Patrick J. Boyle, Assistant Attorney General, Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

Nicholas R. Reaves, Eric C. Rassbach, and Daniel L. Chen, Becket Fund for Religious Liberty, Washington, D.C., for Amicus Curiae Becket Fund for Religious Liberty.

Corene Kendrick, American Civil Liberties Union Foundation, San Francisco, California; Emerson Sykes and Vera Eidelman, American Civil Liberties Union Foundation, New York, New York; Daniel Mach and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, D.C.; Victoria Lopez, American Civil Liberties Union Foundation of Arizona, Phoenix, Arizona; for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Arizona.

## OPINION

BYBEE, Circuit Judge:

Appellant Edward Lee Jones, Jr. is incarcerated at the Arizona State Prison Complex—Eymen. In late 2017 and early 2018, Jones ordered by mail six hip-hop, R&B CDs and two Nation of Islam texts. All of the items were confiscated as contraband pursuant to an Arizona Department of Corrections (ADC) order, which dictates what publications are allowed in ADC facilities. The issue before us is whether these confiscations violated Jones's rights under the Free Speech and Free Exercise Clauses of the First Amendment, as made applicable to Arizona by the Due Process Clause of the Fourteenth Amendment, or the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1 et seq. The district court granted summary judgment in favor of the Arizona Defendants on Jones's claims under 42 U.S.C. § 1983 and RLUIPA.

We conclude that genuine issues of material fact exist both as to whether the Arizona Department of Corrections applied its order inconsistently as to the CDs, in violation of

Jones's free-speech rights, and whether the exclusion of Jones's Nation of Islam texts substantially burdened his religious exercise in violation of RLUIPA and the Free Exercise Clause. Because these questions preclude summary judgment, we reverse and remand to the district court for further proceedings.

## I.  BACKGROUND

### A.  *ADC's Inmate Mail Policy*

The Arizona Department of Corrections regulates the content of incoming mail pursuant to Department Order 914 (DO 914), *Inmate Mail*, effective April 7, 2017.  DO 914's stated purpose is "maintaining the safety, security and orderly operations of the institutions."  Under the policy, staff at each ADC facility will "open, inspect and read incoming mail to prevent criminal activity and prevent inmates from receiving contraband or any other material that may be detrimental to the safe and orderly operation of the institution."  DO 914.02 § 1.5.  Publications—which include CDs, books, and magazines—are subject to additional procedures.  First, they must come directly from a publisher, distributor, or retailer. DO 914.03 § 1.3; DO 914.06 § 1.4.  Second, ADC staff inspect the content of each CD or publication that enters ADC facilities "[i]n order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers."  DO 914.07 § 1.1.  DO 914.07, titled "Unauthorized Content," sets forth twenty broad categories, including nudity, sexual activity, street gangs, martial arts, the functioning of security devices, drug use, weapons, computers, tattooing, ciphers or codes, acts of violence, and canine search procedures.  It also has a catch-all provision for any publication deemed "detrimental

to the safe, secure, and orderly operation of the institution."
DO 914.07 § 1.2. As relevant here, DO 914.07 prohibits
inmates from receiving publications containing the following:

> § 1.2.2.3: Publications depicting in either
> visual, audio, or written form: "[s]exual
> intercourse, vaginal or anal, fellatio,
> cunnilingus, bestiality, or sodomy."

> § 1.2.4: "Depictions or descriptions of street
> gangs and/or Security Threat Groups (STG),
> and related gang/STG paraphernalia,
> including, but not limited to, codes, signs,
> symbols, photographs, drawings, training
> material, and catalogs."

> § 1.2.7: "Depictions or descriptions, or
> promotion of drug paraphernalia or
> instructions for the brewing of alcoholic
> beverages or the manufacture or cultivation of
> drugs, narcotics or poisons."

> § 1.2.8: "Content that is oriented toward
> and/or promotes racism and/or religious
> oppression and the superiority of one
> race/religion/political group over another,
> and/or the degradation of one
> race/religion/political group by another."

> § 1.2.16: "Pictures, depictions or illustrations
> that promote acts of violence including, but
> not limited to, murder, rape, sexual assault,
> assault, amputation, decapitation,
> dismemberment, mutilation, maiming,

disfigurement, crime scene/autopsy photographs, or cruelty to animals."

§ 1.2.17: "Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy."

§ 1.2.20: "Any publication or part of a publication that, although not specifically set forth herein, may otherwise be detrimental to the safe, secure, and orderly operation of the institution."

In order to promote consistent application of its policy, ADC maintains a statewide database of exclusion decisions. Publication review staff regularly cross-check to see if a publication under review has either been excluded or allowed by another ADC facility. Publications that have been previously excluded or allowed in one facility will similarly be excluded or allowed in other ADC facilities. Inmates and publishers have thirty days to appeal the publication review staff's decision to the Office of Publication Review (OPR), which handles appeals from all ADC complexes. DO 914.08 § 1.2. OPR's decisions, which are denominated "second-

level review" are final and exhaust an inmate's administrative remedies.  DO 914.08 § 1.2.2.5.

B.  *Facts*

The following facts are largely undisputed.  Jones has been in ADC's custody since 2008.  He is a member of the Nation of Islam and a follower of the teachings of Elijah Muhammad, who Jones considers to be the last prophet of Allah.  Jones believes that Elijah Muhammad's writings are essential religious texts that provide him with religious instruction, including teachings on how to pray.  Jones considers Elijah Muhammad's writings central to his belief system and that reading Muhammad's texts is one way he may practice and express his religion.  For adherents of the Nation of Islam, Ramadan is a holy month of fasting, self-reflection, and service to humanity.  Nation of Islam members in ADC facilities have access to the Qur'an and the ability to pray in their cells.  Jones is also a fan of rap and R&B music.

In late 2017 and early 2018, Jones ordered six CDs and two books that ADC classified as contraband and confiscated. The CD's excluded as violating DO 914.07 were:

> (1) "untitled unmastered" (2016) by Kendrick Lamar, a Grammy- and Pulitzer Prize-winning artist, for violating the violence and sexual excitement provisions, §§ 1.2.16, 17.

> (2) "Tha Blue Carpet Treatment" (2006) by Grammy-nominated artist Snoop Dogg for violating the gangs, drugs, and violence provisions, §§ 1.2.4, 7, 16.

(3) "Street Gospel" (1997), by Suga Free for violating the sexual intercourse, gangs, drugs, violence, and sexual excitement provisions, §§ 1.2.2.3, 1.2.4, 7, 16, 17.

(4) "Trials & Tribulations" (2013), by Ace Hood for violating the sexual intercourse, violence, sexual excitement, and catch-all provisions, §§ 1.1, 1.2.2.3, 1.2.16, 17, 20.

(5) "The D-Boy Diary Book 1" (2016) by E-40 for violating the gangs, drugs, violence, and catch-all provisions, §§ 1.2.4, 7, 16, 20.

(6) "Trilogy" (2012), a triple-platinum album by Grammy-winning artist The Weeknd, for violating the drugs and sexual excitement provisions, §§ 1.2.7, 17.

Jones requested second-level review of the CD exclusions. All exclusions were upheld by OPR.

Jones had also ordered two books by Elijah Muhammad: *Message to the Blackman in America* (1965) and *The Fall of America* (1973). Both were excluded under DO 914.07 § 1.2.8 for promoting racism or the superiority of one group. ADC staff excluded the books without review because each text had been previously excluded by an ADC facility. Jones sought second-level review of the text exclusions, but OPR informed Jones that the exclusions of *Messages to the Blackman* and *The Fall of America* had been upheld previously and that those second-level decisions would remain final.

C.  *Procedural History*

In June 2018, Jones lodged a pro se civil rights complaint in district court under 42 U.S.C. § 1983, alleging on-its-face and as-applied violations of the Free Speech and Free Exercise Clauses of the First Amendment and Due Process Clause of the Fourteenth Amendment as well as a violation of RLUIPA.  Jones sought injunctive and monetary relief, including punitive damages, against seven defendants: Charles Ryan, the Director of the ADC; Doe #1, Deputy Director of ADC; Carson McWilliams, ADC's Division Director of Support Services; S. Slade, an ADC property officer; D. Miller, an ADC employee at OPR; J. Guzman, an ADC employee at OPR; and Lori Stickley, Deputy Warden. The district court screened the complaint as required by 28 U.S.C. § 1915(a) and dismissed Defendants Doe #1, McWilliams, and Stickley, as well as several of Jones's claims.  The court allowed Jones's suit to proceed against ADC Director Ryan in his official capacity and against Defendants Slade, Miller, and Guzman in their individual capacities.[1] The court later dismissed defendant Guzman, and it substituted newly appointed ADC Director David Shinn for former Director Ryan.

---

[1] Officer Slade informed Jones of the confiscation, but played no role in reviewing the publications.  Officer Miller personally reviewed "untitled unmastered" by Kendrick Lamar and "Tha Blue Carpet Treatment" by Snoop Dog as part of OPR's second level review, and she confirmed the publication staff's decision to exclude the CDs.  Miller also responded to Jones's request for second level review of *Message to the Blackman in America* and *The Fall of America*.  She informed Jones that OPR had already reviewed the decisions to exclude the texts so no further review would take place.  Officer Guzman, who was dismissed because Jones failed to serve him, made the decision to uphold the exclusion of the remaining four CDs.

The district court granted summary judgment in favor of the Defendants on all claims. Evaluating Jones's facial challenge to DO 914 under *Turner v. Safley*, 482 U.S. 78 (1987), the court rejected Jones's free speech challenge, holding that ADC's interests—rehabilitation, reducing sexual harassment, and preventing a hostile environment—were legitimate and that there was a rational connection between those interests and restricting inmates' access to explicit materials. The court found that inmates' access to the radio and non-explicit publications provided an adequate alternative. The court credited ADC's assertion that allowing prohibited material would be detrimental to the prison environment. And, the court found that Plaintiff's suggestion that existing disciplinary procedures are adequate to address ADC's concerns is not an obvious alternative to the policy. Because the court found that all four of the *Turner* factors weighed in ADC's favor, it concluded that DO 914.07 was not unconstitutional on its face and granted summary judgment for Defendant Shinn, who was sued in his official capacity. With respect to Jones's as-applied claim, the court granted summary judgment for Defendants Slade and Miller, finding that Jones failed to demonstrate a dispute as to whether either defendant personally violated his First Amendment rights because Slade was not involved in the decisions to exclude his CDs and there was no evidence that Miller's decisions on two of the CDs were incorrect.

The district court also granted summary judgment with respect to Jones's RLUIPA and free-exercise claims because the court held that the exclusion of the two religious texts did not substantially burden Jones's religious practice. The court concluded that Jones had "not articulated why he was able to successfully observe Ramadan for the 10 years *prior* to 2018, or what has occurred to render him now unable to

successfully observe Ramadan *without* the books he requested."

## II.  STANDARD AND SCOPE OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  "We review a district court's grant of summary judgment *de novo*, and may affirm on any basis supported by the record." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009).  "Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56." *Id.*  "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."  *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002).

Jones has narrowed the scope of our review of the district court's order.  In the district court, Jones sought an injunction ordering ADC not to destroy his property.  The court denied his request, and Jones has not challenged that determination on appeal.  Jones has not appealed the district court's judgment that DO 914 is constitutional on its face.  Jones also does not challenge the grant of summary judgment as to Defendant Slade in her individual capacity with respect to his free-speech claim.  We are thus left with Jones's request for declaratory and injunctive relief against ADC Director Shinn, who was sued in his official capacity, and his damages claim against Miller, who was sued in her individual capacity.  Both of those claims relate to Jones's free speech claim with respect to the CDs.  Jones also appeals the district court's judgment with respect to his RLUIPA and the Free Exercise Clause claims; both of those claims relate to the books he requested.

## III.  DISCUSSION

Jones has two principal complaints—that ADC prohibited his receipt of six music CDs and two books by Elijah Muhammad.  His complaint concerning the CDs invokes the Free Speech Clause, while his complaint concerning the books invokes RLUIPA and the Free Exercise Clause.  As we have different considerations under these provisions, we will consider the CDs and his free-speech claims first and then address the books and his RLUIPA and free-exercise claims.

A.  *CDs—Free Speech*

Jones argues that the exclusion of his six CDs pursuant to DO 914.07 violates his First Amendment free-speech rights and that the district court erred in granting summary judgment.  Jones contends that there is a triable issue as to whether ADC applies the regulation neutrally.

It is well established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner*, 482 U.S. at 84.  Inmates retain their constitutional rights, and "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights."  *Id.* (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)).

Prisoners have a First Amendment right to receive information while incarcerated.  *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1151 (9th Cir. 2004).  At the same time, that principal must be balanced against the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."

*Turner*, 482 U.S. at 84 (quoting *Procunier*, 416 U.S. at 405). We "apply a deferential standard of review to challenges regarding prison regulations" derived from *Turner*. *Mauro v. Arpaio*, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc); *see also Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) ("[R]egulations affecting the sending of a 'publication' . . . to a prisoner must be analyzed under the *Turner* reasonableness standard."). Under *Turner*, a "regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89.

*Turner* requires us to consider four factors in determining whether DO 914 is reasonably related to legitimate penological interests. 482 U.S. at 89–91; *Mauro*, 188 F.3d at 1058–59. First, there must be a "'valid, rational connection' between the prison regulation and the legitimate government interest put forth to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, we consider whether there are alternative means of exercising the right left open to inmates. *Id.* at 90. Third, we weigh "the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, we look for ready alternatives to the policy which would indicate that the policy may be an "'exaggerated response' to prison concerns." *Id.*

The first *Turner* factor is the most important. To evaluate whether a valid, rational connection exists, we must determine "whether the governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) whether the policy is 'rationally related to that objective.'" *Mauro*, 188 F.3d at 1059 (quoting *Abbott*, 490 U.S. at 414).

The district court properly concluded that ADC offered legitimate governmental objectives to justify DO 914. The asserted goal of ADC's mail policy is "maintaining the safety, security and orderly operations of the institution[]," and the goal of the provisions banning certain publications is "assist[ing] with rehabilitation and treatment objectives, reduc[ing] sexual harassment, and prevent[ing] a hostile environment for inmates, staff and volunteers." There is no question that securing the safe and orderly operation of our prisons and fostering rehabilitation of the inmates are legitimate goals. *See Pell v. Procunier*, 417 U.S. 817, 823 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security . . . ."); *Turner*, 482 U.S. at 91 (prison security); *Abbott*, 490 U.S. at 415 (prison security); *Mauro*, 188 F.3d at 1059 (prison security, rehabilitation, and reducing sexual harassment of guards).

In the district court, ADC provided affidavits from administrators in Offender Operations and OPR to support the connection between the DO 914 and their objectives. The administrators explained that "[p]ublications with depictions or descriptions, or promotion of drug paraphernalia . . . are detrimental to the security of the prison because [they] promote[] prohibited behavior," "[p]ublications that contain depictions that promote acts of violence . . . are detrimental to institutional security and the goals of rehabilitation," and "[p]ublications that contain depictions or descriptions of street gangs and/or Security Threat Groups (STG) . . . are detrimental to the security of the prison because they promote prohibited behavior."

To show a rational relationship between the regulation and the legitimate interest, prison officials "need not prove that the banned material actually caused problems in the past,

or that the materials are 'likely' to cause problems in the future" unless the inmate "presents evidence to refute a common-sense connection between the regulation and the government objective." *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922–23 (9th Cir. 2003) (quoting *Mauro*, 188 F.3d at 1060). Nor must we agree with the prison officials' judgment on whether the policy in fact advances their proffered penological interests. *Mauro*, 188 F.3d at 1060. Because the Defendants could reasonably believe that excluding publications that contain sexual content, drugs, and violence would decrease prohibited behaviors among inmates, the governmental objective underlying DO 914 is legitimate and rationally related to ADC's interests in prison security, rehabilitation, and reducing sexual harassment. *See id.* Further, Jones did not challenge the connection between the regulation and the objective.

But that does not end the inquiry under the first *Turner* factor. We must still determine whether the challenged regulation is neutral. *Turner*'s neutrality requirement requires some explanation. At issue in *Turner* was Missouri's restriction on inmate-to-inmate correspondence. Although Missouri permitted an inmate to correspond with "immediate family members" who were inmates at other institutions, it severely restricted correspondence between unrelated inmates; in fact, the district court found that the restriction was effectively a prohibition on such correspondence. *Turner*, 482 U.S. at 81–82. Missouri explained that the restriction deterred gang activity and prevented inmates from communicating escape plans and planning assaults. *Id.* at 91. The Supreme Court held that the appropriate test was "whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id.* at 90. Although

Missouri's regulation was broader than would have been absolutely necessary, the Court held that the regulation was "not an exaggerated response" because it would have been "impossible to read every piece of inmate-to-inmate correspondence" and there was "an appreciable risk of missing dangerous messages." *Id.* at 93.

In *Abbott*, the Court elaborated on *Turner*'s neutrality requirement:

> [T]he regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Where . . . prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner*.

490 U.S. at 415–16 (internal quotations and citations omitted). The Fifth Circuit has explained the importance of the neutrality inquiry:

> Requiring neutrality ensures that the prison's application of its policy is actually based on the justifications it purports, and not something more nefarious. Were we to ignore *Turner*'s neutrality requirement, we would allow prison regulators to justify a policy based on a legitimate interest applicable to the overall prison population, while applying the policy in an arbitrary or discriminatory

> manner in violation of a particular subgroup's
> First Amendment rights.

*Mayfield v. Tex. Dep't of Crim. Just.*, 529 F.3d 599, 609 (5th Cir. 2008).

*Turner* neutrality is not the "content neutrality" we demand in other areas of First Amendment jurisprudence. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." (internal quotations and emphasis omitted)). Prison regulations of speech need not be content neutral like time, place, and manner restrictions, *see Pell*, 417 U.S. at 826–27; in fact, they may be content intensive. *See Turner*, 482 U.S. at 88 (distinguishing content-based prison regulations from true time, place, and manner restrictions); *Hanrahan v. Mohr*, 905 F.3d 947, 955 (6th Cir. 2018) ("Appellants are incorrect that the 'neutrality' requirement of *Turner*'s first prong requires a prison regulation to be completely content neutral."). Prison officials may restrict inmates' access to materials dealing with sex, violence, drugs, and gangs—censorship that we would not permit in other contexts. *Turner* has made clear that regulations that could not withstand constitutional scrutiny outside of the prison context may be acceptable inside an institution. *See Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality opinion) ("[T]he Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere."); *Abu-Jamal v. Price*, 154 F.3d 128, 133–34 (3d Cir. 1998) ("We analyze content neutrality in the prison context differently than we do for non-inmates.").

As in *Turner*, the Arizona procedure at issue here is not content neutral in the traditional sense.  DO 914 is content-focused.  But on appeal, Jones does not challenge the regulation on its face.  He does not argue that ADC may not suppress music that has sexually explicit lyrics or lyrics that promote violence or drugs.  Rather, his claim is that Arizona has been inconsistent in its application of its regulation in a way that is not content neutral *within the category of suppressible media*.  He argues that certain genres of music—particularly rap music—are censored, while other music, TV shows, or movies are permitted, even though they also have explicit sexual, drug, or violent content. Effectively, the question Jones raises is not whether ADC can suppress certain kinds of content, but whether ADC has applied the regulation in a neutral fashion.  *See Turner*, 482 U.S. at 89–90.  The Supreme Court has explained that in considering the reasonableness of a prison regulation "it [is] important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion." *Id.* at 90.

When there is evidence that an otherwise legitimate policy is being applied in a discriminatory manner, we inquire whether the unequal application of the policy defeats the rational relationship between the policy and the government's asserted justification.  *See id.*  Evidence of inconsistent application of a regulation may be  proof that the policy is not neutral and may preclude summary judgment on an as-applied challenge.  *See Mayfield*, 529 F.3d at 609 ("[U]nder *Turner*, neutrality must be ensured, or its absence sufficiently explained in light of a legitimate penological interest, for summary judgment to be appropriate."); *Abu-Jamal*, 154 F.3d at 134 (explaining that because "the Department's enforcement of the [challenged rule], was motivated, at least

in part, by the content of [plaintiff's] articles . . . the actions were not content neutral").

Jones has proffered sufficient evidence of inconsistent application of DO 914 to preclude summary judgment. Jones submitted three affidavits, his own and those of two other ADC prisoners, Hawkins and Page, alleging that ADC's exclusions between 2015–2018 targeted black artists and that ADC has not applied DO 914 consistently. ADC argues that we should not credit Jones's affidavits because they are unsupported by factual data and "[n]either Jones nor the other two inmates could possibly claim to have personal knowledge of how the OPR applies DO 914.07 on a statewide basis." But Jones is not required to provide a comprehensive study of ADC's statewide implementation of DO 914. That Jones and the other two inmates are just three of "over 39,000 inmates in the Arizona prison system" does not undermine their personal experience with the policy. All three men have been incarcerated in ADC's facilities for periods spanning from 1998 to the present and have testified to their experience with the implementation of DO 914 and the type of media that is available in ADC facilities. Jones, Hawkins, and Page each spoke to specific instances in which content that violates DO 914 was allowed.

Further, Jones submitted evidence that inmates at ADC have access to a range of other media, including books and television shows, that contain content clearly violating DO 914.07. We would expect some inconsistencies in any policy that delegates exclusions to multiple decision makers. Even the clearest of policies would not be immune from human error. But the inconsistencies identified by Jones go beyond the occasional explicit song being allowed or book being excluded. Jones has supplied some evidence that ADC

*affirmatively provides* inmates access to books, music, and television programs that plainly violate DO 914. For example, Jones submitted evidence that inmates have access to shows like *L.A. Gang Wars*; *Moonshiners*; *Drugs, Inc.*; *Nazi Underworld*; *Aryan Brotherhood*; and *Dexter*. We cannot determine merely by reading the titles whether these materials violate ADC's prohibitions on publications containing "depictions or descriptions" of "street gangs" or "drug paraphernalia" but we may draw a reasonable inference that they do. *See* DO 914.07 § 1.2.4, 1.2.7. Jones also provided excerpts from ADC's library catalog and inmate testimony showing that ADC provides inmates access to books like James Patterson's *Kiss the Girls*, a psychological thriller about the serial killing of young women, and an entire selection of romance novels, which "may . . . cause or encourage sexual excitement." *Id.* § 1.2.17. Providing inmates access to the type of content ADC claims is "detrimental to institutional security and the goals of rehabilitation," calls into question the rational relationship between DO 914 and ADC's legitimate penological interests and the reasonableness of the policy. *Cf. Pell*, 417 U.S. at 828 ("So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it . . . does not abridge any First Amendment freedoms retained by prison inmates.").

We repeat: Variations in the enforcement of a policy will not always rise to the level of inconsistent application. *Turner* does not require ADC to apply DO 914 without error to the hundreds of magazines and publications that ADC's prison complexes receive each week. ADC candidly admitted before the district court that "despite its best efforts[, ADC] does not keep out all unauthorized material." And we agree with ADC's assertion that "[t]he test is not

whether all possible content that could be excluded is actually excluded." Indeed, the Supreme Court acknowledged in *Abbott* that "seeming 'inconsistencies'" produced by the exercise of discretion in applying prison regulations "are not necessarily signs of arbitrariness or irrationality." *Abbott*, 490 U.S. at 417 n.15. But despite holding that the regulations in *Abbott* were facially valid, the Court remanded for consideration of the respondents' claim that "variability in enforcement of the regulations stems from the censors' subjective views." *Id.* at 417 n.15, 419. The Court explained that whether exclusions are in fact based on the prison's asserted security interest "go[es] to the adequacy of the regulations as applied." *Id.* at 417 n.15.

The district court acknowledged Jones's argument that "a majority of [ADC's] exclusions targeted black artists" and that "OPR is not and has never been consistent in publications decisions." Nevertheless, with respect to Jones's as-applied claim against Officer Miller, the district court concluded that Jones did "not allege that the CDs [Officer] Miller reviewed did not violate DO 914.07, nor [did] he present any evidence that Miller incorrectly applied DO 914.07." The district court did not address Jones's request for declaratory and injunctive relief against Warden Shinn, which would necessarily require a broader inquiry than Officer Miller's decision.

We think the district court misconceived its responsibility with respect to the as-applied challenge. At this stage of the litigation, Jones does not contest that the CDs he ordered might violate DO 914. Rather, he claims that they were excluded, while other objectionable material was routinely made accessible to inmates. His is a comparative claim. It may well be that Officer Miller correctly applied DO 914; Jones's claim is that DO 914 was consistently applied to rap

music but inconsistently applied to other music genres and media. And that calls into question the neutrality of DO 914 as it is applied and, thus, the legitimacy of ADC's policy. Viewing the evidence in the light most favorable to Jones, there is a material question of fact here—whether ADC selectively enforces DO 914 against disfavored expression, rap and R&B musical genres. The district court should not have granted summary judgment on this record. *See Mayfield*, 529 F.3d at 608–09 (holding that affidavits from two other inmates that a prison's policy was not imposed against certain groups was sufficient to raise a material issue of fact as to neutrality).

The first *Turner* factor is a sine qua non. *See Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) ("If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." (citation omitted)); *Morrison v. Hall*, 261 F.3d 896, 907 (9th Cir. 2001); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (citing *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990)). Because a genuine issue of fact remains as to whether there is a valid, rational connection between DO 914, as applied to Jones, and ADC's legitimate interests in security, rehabilitation, and reducing sexual harassment, we need not address the remaining *Turner* factors. We reverse the grant of summary judgment with respect to the CD's ADC withheld from Jones and remand for further proceedings. We express no views on the merits of Jones's claims.**[2]**

---

**[2]** We note that Jones cannot sustain his damages claim against Officer Miller unless he can demonstrate that she personally applied DO 914 inconsistently. He may, however, be able to maintain his claim for equitable relief against Warden Shinn if he can demonstrate systemic

B.  *Religious Texts*

Jones's remaining claims relate to the confiscation of two religious texts, *Message to the Blackman in America* and *The Fall of America*, both by Elijah Muhammad.  The district court held that Jones "failed to demonstrate that the exclusion of his two requested books has substantially burdened his religious practice," defeating both his RLUIPA and Free Exercise Clause claims.  On appeal, Jones argues that the district court misidentified the religious exercise at issue, imposed a categorical forfeiture rule unsupported by RLUIPA, and did not view the facts in the light most favorable to Jones, as is required on summary judgment.  We agree.

1.  RLUIPA

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  Those statutory standards, drawn from *Sherbert v. Verner*, 374 U.S. 398, 403, 406 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 214–15, 221, 236 (1972), are more generous to the religiously observant than the Free Exercise Clause.  *See Emp. Div. v. Smith*, 494 U.S. 872, 883–84 (1990) (limiting *Sherbert* to "the unemployment compensation field"); *see also* Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb(b)(1) (adopting a similar standard to RLUIPA and citing *Sherbert*

---

inconsistency by the many officers who enforce DO 914.

and *Yoder*). RLUIPA covers state-run institutions including prisons, where "the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise." *Cutter v. Wilkinson*, 544 U.S. 709, 720–21 (2005) (citing 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)).[3] RLUIPA reflects a congressional effort to accord heightened protection to religious exercise. *Id.* at 714. As such, RLUIPA is to be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-3(g)).[4]

Under RLUIPA, the plaintiff bears the initial burden of demonstrating that an institution's policy constitutes a substantial burden on his exercise of religion. 42 U.S.C. § 2000cc-2(b). A policy may impose a substantial burden on religious exercise in a number of ways. A regulation may impact religious exercise directly, by forbidding conduct that an inmate believes he is religiously compelled to do, *see O'Lone v. Est. of Shabazz*, 482 U.S. 342, 344–45, 347 (1987)

---

[3] RLUIPA applies to the States and their subdivisions and is an exercise of congressional authority under the Spending and Commerce Clauses. *See* 42 U.S.C. § 2000cc-1(b); *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). ADC does not contest that it is subject to RLUIPA.

[4] Monetary damages are not available against prison officials in their individual capacities under RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 285 (2011) (holding RLUIPA's authorization of "appropriate relief" did not "clearly and unambiguously waive sovereign immunity to private suits for damages"). A RLUIPA plaintiff may only sue defendants in their official capacities for prospective injunctive relief. *Woody v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) ("[RLUIPA] does not authorize suits against a person in anything other than an official or governmental capacity . . . .").

(assigning Muslim prisoners to a work schedule that prevented them from attending Friday prayer services commanded by Qur'an), or by compelling an inmate to do that which he believes he is religiously forbidden from doing, *see Holt*, 574 U.S. at 355, 359 (requiring Muslim prisoner to violate religious beliefs that forbade trimming his beard); *Warsoldier*, 418 F.3d at 992, 995–96 (requiring Native American prisoner to violate religious beliefs that forbade cutting his hair).  More subtly, a regulation may impact religious exercise indirectly, by encouraging an inmate to do that which he is religiously prohibited or discouraged from doing, *see Greenhill v. Clarke*, 944 F.3d 243, 250–51 (4th Cir. 2019) (withholding participation in religious services "as an incentive to improve inmate conduct"), or by discouraging an inmate from doing that which he is religiously compelled or encouraged to do, *see Jones v. Carter*, 915 F.3d 1147, 1150–51 (7th Cir. 2019) (discouraging inmates from choosing halal meals by charging for halal meat); *Shilling v. Crawford*, 536 F. Supp. 2d 1227, 1233 (D. Nev. 2008) (offering Jewish prisoner the choice between staying at a medium security facility without kosher meals or transferring to a maximum security facility with kosher meals), *aff'd* 377 F. App'x 702 (9th Cir. 2010).  *See also Sherbert*, 374 U.S. at 404 (holding that a state may not force a person "to choose between following the precepts of her religion and forfeiting benefits . . . . Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [a person] for her . . . worship").  The difference between these categories may not always be clear, but the framework may help us understand what is at stake.

Once an inmate makes a prima facie showing, the burden shifts to the government to prove that the burden is the least restrictive means of furthering a compelling governmental

interest.  42 U.S.C. §§ 2000cc-1(a), -2(b); *see Fuqua v. Ryan*, 890 F.3d 838, 848 (9th Cir. 2018).  Although RLUIPA adopts a compelling interest standard, context matters in the application of the standard, and courts should act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (quoting 146 Cong. Rec. at 16699).

### a.   Substantial burden on religious exercise

In assessing a RLUIPA claim, we must first identify the religious exercise at issue.  *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008).  Jones argues that his religious exercise is "the reading of essential Nation of Islam texts during Ramadan," while ADC argues that the exercise is "observing Ramadan," which ADC claims Jones may do without reading Elijah Muhammad's books.

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). That means that RLUIPA protects not only practices deemed orthodox by some recognized religious organization, but also idiosyncratic practices—practices "not compelled by, or central to, a [given] system of religious belief." *Id.*  It also means that RLUIPA not only protects an inmate's past religious practices, but also changes in his religious practice within a tradition or conversion from one tradition to another. We have read RLUIPA's reference to "any exercise of religion" literally (and thus broadly in favor of inmates) to include not only "the belief and profession" of faith, but also individual "physical acts [such as] assembling with others for

a worship service [or] participating in sacramental use of bread and wine." *Greene*, 513 F.3d at 987 (alteration in original) (quoting *Cutter*, 544 U.S. at 720); *see also Holt*, 574 U.S. at 361–62 (religious exercise was "the growing of a 1/2-inch beard"); *Greene*, 513 F.3d at 988 (relevant exercise was group worship not Christianity); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (relevant exercise was a Christian school's attempted "conversion of real property for the purpose of religious exercise" (quoting 42 U.S.C. § 2000cc-5(7)(B)); *accord Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007) (relevant exercise was keeping kosher and observing the Jewish Sabbath); *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007) (relevant exercise was inmate's ability to preach to other inmates); *Lovelace v. Lee*, 472 F.3d 174, 187–88 (4th Cir. 2006) (religious exercise was observing Ramadan and attending group prayer services).

The district court characterized Jones's religious exercise broadly as observing Ramadan rather than reading Nation of Islam texts during Ramadan. Its treatment of Jones's claim was not entirely consistent. The district court first characterized Jones's RLUIPA claim during the statutory screening of the initial complaint per 28 U.S.C. § 1915A(b)(1)–(2) as follows:

> Plaintiff claims Defendant Miller's decision denied Plaintiff his due process right to his property and his rights under RLUIPA because he was denied his "right to read his Nation of Islam text during Ramadan as he normally does every year" and he was not able to "freely practice [his] religious beliefs" or "obtain religious instructions through his

religious literature during the holy month of
Ramadan."

This was in line with Jones's own declaration which stated
that "[t]he religious practice in question here, is not per se
Ramadan itself, but for Mr. Jones, to be able to purchase,
possess and read his choice of religious text, authored by the
(Prophet) and Honorable Elijah Muhammad . . . during
Ramadan and in General."   In its summary judgment
decision, however, the district court first repeated that the
religious exercise at issue was Jones's "right to read his
Nation of Islam text during Ramadan, *as he normally does
every year*." (Emphasis altered).  But when the court reached
the substantial burden analysis, it only assessed whether
Jones was able to "successfully observe Ramadan *without* the
books he requested." (Emphasis in original).  Effectively, the
district court asked whether Jones could observe Ramadan
without reading Muhammad's texts because it thought Jones
had done so before.

It was error for the district court to re-characterize Jones's
religious obligations at a higher level of generality.   In
*Greene*, we addressed the level of specificity we must
consider when addressing RLUIPA claims.   513 F.3d
at 987–88.  Greene was an inmate housed in the maximum
security unit of the county jail, awaiting trial on charges of
making terrorist threats and false imprisonment.  *Id.* at 985.
Greene asked to attend religious services and attempted to
conduct group Bible studies and other communal meetings.
*Id.*  Instead, the county offered him a Bible, religious texts,
and a visit from the chaplain.  *Id.*  The county urged us to
consider Greene's "religious exercise" as "the general
practice of one's religion rather than any particular practice"
so that the county could "impose outright bans on particular

aspects of an inmate's religious exercise, so long as, in the aggregate, those bans do not amount to a substantial burden." *Id.* at 987. We rejected the county's reading of RLUIPA and held that "the 'religious exercise' at issue in Greene's lawsuit is group worship, not Christianity." *Id.* at 988. So defined, we easily concluded that the county's ban on group worship was a substantial burden on Greene's religious exercise, and the burden shifted to the county to show that it had a compelling interest and had imposed the least restrictive means of securing that interest. *Id.* at 988–90.

Having defined the scope of Jones's religious exercise—reading his Nation of Islam texts during Ramadan—we next consider whether excluding Jones's texts as contraband constitutes a substantial burden on his religious exercise. A substantial burden exists when the state places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Warsoldier*, 418 F.3d at 995 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)). The burden must impose "a significantly great restriction or onus upon such exercise." *Id.* (quoting *San Jose Christian Coll.*, 360 F.3d at 1034). The district court found that withholding Muhammad's texts imposed no substantial burden on Jones's religious exercise because Jones did not "articulate[] why he was able to successfully observe Ramadan for the 10 years *prior* to 2018, or what has occurred to render him now unable to successfully observe Ramadan *without* the books he requested."**[5]**    Because

_____

**[5]** We are puzzled by the basis for the district court's inference that Jones had not previously read Muhammad's texts in connection with Ramadan. Jones's complaint stated: "Plaintiff [was] denied [the] right to read his Nation of Islam texts during Ramadan, *as he normally does every year*." At this stage, we are required to view the record evidence in the

RLUIPA does not require Jones to show his religious exercise was either required by his faith or consistent with his past observance, we disagree.

First, Jones's right to read religious texts during Ramadan is protected by RLUIPA whether he has read those texts every year during Ramadan or only recently came to the conclusion that he should do so.  We do not "prescribe what shall be orthodox in . . . religion, or other matters of opinion." *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943). Jones does not forfeit his claim because he may have previously failed to adhere to the practice of reading the texts during Ramadan.  *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (holding that plaintiff had a valid free exercise claim based on his desire to use his Islamic name in prison, even though he did not use that name at the time of his conversion), *supplemented*, 65 F.3d 148 (9th Cir. 1995).  The Supreme Court has explained that the timing of the adoption of a religious belief is "immaterial" to the determination of whether a person's religious exercise has been burdened. *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144 (1987) (refusing to "single out the religious convert for different, less favorable treatment than that given an individual whose adherence to his or her faith [is less recent]"); *see also Callahan v. Woods*, 658 F.2d 679, 687 (9th

---

light most favorable to Jones.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  That statement suggests to us that Jones had read Muhammad during Ramadan, although it does not state how he had access to Muhammad's books.  The record shows that Jones was transferred to a new housing unit less than two months before he ordered the Elijah Muhammad texts.  One inference in Jones's favor is that he had access to the texts until the time of his transfer.  Nevertheless, the district court assumed that Jones "was able to successfully observe Ramadan for the 10 years *prior* to 2018 . . . *without* the books he requested."

Cir. 1981) ("So long as one's faith is religiously based at the time it is asserted, it should not matter . . . whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible."). There is no legal basis to fault Jones for not adding the study of Elijah Muhammad's texts during Ramadan to his religious practice sooner; he did not waive his rights by not studying these texts in the past.

Second, the district court's inquiry into whether the religious texts are required for Jones to observe Ramadan misunderstood the RLUIPA analysis. RLUIPA explicitly applies to "any exercise of religion, *whether or not compelled by* . . . a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added); *see Holt*, 574 U.S. at 362 ("RLUIPA . . . applies to an exercise of religion regardless of whether it is compelled." (internal quotations and citation omitted)). We have held that "RLUIPA 'bars inquiry into whether a particular belief or practice is central to a prisoner's religion.'" *Greene*, 513 F.3d at 986 (internal quotations omitted) (quoting *Cutter*, 544 U.S. at 725 n.13). It is enough that reading Elijah Muhammad's texts during Ramdan is a sincere component of Jones's religious practice, without reference to whether Jones, or other members of the Nation of Islam, consider the practice mandatory. *See Holt*, 574 U.S. at 362–63 ("RLUIPA . . . is 'not limited to beliefs which are shared by all of the members of a religious sect.'" (quoting *Thomas*, 450 U.S. at 715–16)). Even so, Jones offered evidence that the teachings of Elijah Muhammad, and particularly his writings in *Message to the Blackman in America*, inform the Nation of Islam's celebration of Ramadan and offered testimony that the writings of Elijah Muhammad are central to his belief system. In *Sutton v. Rasheed*, the Third Circuit held that the deprivation of Elijah

Muhammad's texts was sufficient to make out a Free Exercise claim and that the reading of these texts is "a necessary element" of the exercise of the Nation of Islam faith. 323 F.3d 236, 256 (3d Cir. 2003). Surely, if these texts are essential to the religion, a reasonable jury could find the denial of these texts during Ramadan, a holy time of spiritual reflection, constitutes a substantial burden.

By excluding *Messages to the Blackman in America* and *The Fall of America*, the operation of DO 914 at least burdens Jones's general exercise of his Islamic beliefs. We have had "little difficulty . . . concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Greene*, 513 F.3d at 988. Because there is a genuine issue of fact as to whether denying Jones essential religious texts during Ramadan is a substantial burden on his religious exercise, summary judgment was inappropriate on Jones's RLUIPA claim.

> b. Least restrictive means of furthering a compelling interest

Finding no substantial burden, the district court did not assess whether ADC's policy is the least restrictive means to further a compelling interest. ADC argues its regulations are narrowly tailored to the compelling government interest in institutional security. To carry its burden under RLUIPA, ADC must show "it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999; *see also Holt*, 574 U.S. at 362–63 (RLUIPA requires courts to "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants" (alteration in original)). This is a fact-intensive inquiry on which the

record is not developed. We leave it to the district court on remand to assess whether ADC can demonstrate that applying the challenged regulation to Jones serves a compelling interest and meets the "exceptionally demanding" least-restrictive-means standard. *Holt*, 574 U.S. at 364 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

2.  Free Exercise Clause

The Free Exercise Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The right to free exercise is to be "jealously guarded." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). But free exercise is necessarily limited by the fact of incarceration and "may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *Id.* (citing *O'Lone*, 482 U.S. at 348). To merit protection under the Free Exercise Clause, Jones's belief must be "sincerely held" and religious in nature. *Malik*, 16 F.3d at 333. Once a claimant demonstrates that the challenged regulation impinges on his sincerely held religious exercise, the burden shifts to the government to show that the regulation is "reasonably related to legitimate penological interests." *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015) (quoting *Turner*, 482 U.S. at 89). As we did with respect to Jones's Free Speech claim, we use the *Turner* factors to evaluate whether a prison regulation implicating an inmate's free exercise right is valid. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Ward*, 1 F.3d at 876–77. We note that the Free Exercise Clause analysis differs from RLUIPA's analysis in at least two ways: (1) RLUIPA has an

expanded definition of religious exercise, and (2) RLUIPA
requires the government use the least restrictive means to
advance a compelling interest, while the Free Exercise Clause
only requires that the regulation be reasonably related to
legitimate penological interests. *Greene*, 513 F.3d at 986.

The district court concluded that Warden Shinn was
entitled to summary judgment under the Free Exercise Clause
because Jones "failed to demonstrate that Defendants' [sic]
have substantially burdened the practice of his religion by
excluding his two requested books." For the same reasons
that the district court's analysis was flawed under RLUIPA,
it does not hold up under the Free Exercise Clause. The Free
Exercise Clause does not require plaintiffs to prove the
centrality or consistency of their religious practice: "It is not
within the judicial ken to question the centrality of particular
beliefs or practices to a faith." *Hernandez v. Comm'r*,
490 U.S. 680, 699 (1989); *see also Smith*, 494 U.S. at 887
("Repeatedly and in many different contexts, we have warned
that courts must not presume to determine the place of a
particular belief in a religion . . . ."); *Callahan*, 658 F.2d
at 685 ("In applying the free exercise clause of the First
Amendment, courts may not inquire into the truth, validity, or
reasonableness of a claimant's religious beliefs."). In *Shakur*,
we assessed whether a plaintiff bringing a free-exercise claim
is required to show that the defendant "burdened conduct
mandated by his faith." 514 F.3d at 884 (internal quotations
omitted). Taking into account the Supreme Court's prior
disapproval of a centrality test, we held that "the sincerity test
set forth in *Malik* and *Callahan* determines whether the Free
Exercise Clause applies." *Id.* at 884–85. Here, just as in
*Shakur*, it was impermissible for the district court to focus on
whether reading Elijah Muhammad's texts is required to
observe Ramadan, rather than whether Jones sincerely

believes reading these texts during Ramadan is consistent with his faith. *Id.* at 885.

We have also explained that "religious claims that have developed over time are protected to the same extent as those that occur in a moment." *Malik*, 16 F.3d at 333 (citing *Hobbie*, 480 U.S. at 144 n.9). That Jones may have observed Ramadan without access to Elijah Muhammad's texts in the past does not affect his free-exercise claim. *See id.* ("The ten-year gap between when Malik legally changed his name and when he began to use it exclusively does not attenuate Malik's free exercise claim.").

The district court found that Jones's religious beliefs are sincerely held, and neither party contests this finding on appeal. Because there is a material question as to whether ADC's exclusion of Jones's religious texts pursuant to DO 914 infringes on his right to engage in his sincerely held religious belief, summary judgment was inappropriate. Because the district court did not reach the *Turner* analysis, we leave it to the district court on remand to determine whether DO 914 is rationally related to a legitimate penological interest.

## IV. CONCLUSION

The district court's judgment granting the Defendants' motion for summary judgment is reversed and this case is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**