FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**December 20, 2013**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

STACY GRAHAM,

      Plaintiff - Appellant,

v.

SHERIFF OF LOGAN COUNTY;
RAHMEL FRANCES JEFFERIES;
ALEXANDER ALICIDES MENDEZ,

      Defendants - Appellees.

No. 12-6302

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:10-CV-01048-F)**

---

Michael L. Bardrick, Oklahoma City, Oklahoma, for Plaintiff - Appellant.

Daniel J. Card, Pierce Couch Hendrickson Baysinger & Green, and David W. Lee, Lee Law Center. P.C., (Robert S. Lafferrandre and Randall J. Wood, Pierce Couch Hendrickson Baysinger & Green; Emily B. Fagan, Lee Law Center; and Chris J. Collins and Philip W. Anderson, Collins Zorn & Wagner, P.C., with them on the briefs), Oklahoma City, Oklahoma, for Defendants - Appellees.

---

Before **HARTZ, O'BRIEN,** and **TYMKOVICH,** Circuit Judges.

---

**HARTZ,** Circuit Judge.

---

Two prison guards had sexual intercourse with Stacey Graham while she was in solitary confinement at the Logan County Jail in Oklahoma. The guards confessed and were fired immediately. Ms. Graham then sought damages in a civil-rights complaint under 42 U.S.C. § 1983 against the two guards and the county sheriff. She alleged a violation of the Eighth Amendment prohibition against cruel and unusual punishment, as applied to the states under the Fourteenth Amendment. The United States District Court for the Western District of Oklahoma granted the defendants' motion for summary judgment on the ground that the sexual acts were consensual. We have jurisdiction under 28 U.S.C. § 1291 and affirm. Although we recognize a need to examine consent carefully in the prison context, this case does not present a factual issue with regard to Ms. Graham's consent.

## I. BACKGROUND

Ms. Graham was an inmate at the Logan County Jail, where defendants Rahmel Jefferies and Alexander Mendez were guards. Sometime between July 2009 and October 2009, Jefferies started speaking to Ms. Graham over the jail intercom system, which allowed guards in the control tower to speak to prisoners in their cells. Contact could be initiated by either the guard or the prisoner, but the guard could turn off the system. Ms. Graham and Jefferies began to talk about their likes, dislikes, interests, and families.

Over time they began to talk about having sexual intercourse, and Ms. Graham told Jefferies that she would like a man to make love to her. The two also exchanged sexually explicit notes. One note she wrote to him, but never delivered, stated:

> Hey Sexy, Damn you look good in that uniform. I just want to rip it off of you. I can only imagine what you'll look like in that deputy uniform. Mmm . . . the state troopers uniforms are real sexy! The hat and all. I look forward to f**king you in, or around your patrol car. Damn, just the thought of that gets my nipples hard. I'm such a nympho! Can you deal with that? Because I want it all the time. Seriously, I think I might be a sex addict. So there's a little bit more you know about me. Have I freaked you out yet? I hope not cuz that's not my intention. . . . You haven't smiled for me. What's up? You down? Cheer up handsome. Peace.

Aplt. App. at 42–43. She signed the note "Trouble," which was the nickname Jefferies had given her. Although the notes she had previously delivered to Jefferies were less explicit, they had suggested that she wished to have sexual intercourse with him. She testified at Mendez's trial that she enjoyed the conversations and note-writing and saw their exchanges as a "fling" and "something to do." Aplee. App., Vol. 1 at 115. On one occasion she flashed her breasts at Jefferies, although he did not ask her to do so. She said that she did this "[f]or the hell of it." *Id.* at 79.

On two occasions Jefferies had complied with requests from Ms. Graham—for a candy bar and a blanket. But she did not think that she had received any special treatment from him.

On October 7, 2009, a few weeks after Ms. Graham and Jefferies had begun conversing over the intercom, she was placed in solitary confinement for an unrelated disciplinary infraction. The next evening Mendez called her over the intercom in her cell

3

and asked if she was asleep. Before that night the two had only had brief and appropriate contact. On this occasion, however, Mendez asked about her sexual fantasies and began to tell her about his own. She responded that her fantasy was to "be with two men at the same time." *Id.* at 85. He asked who she would like him to bring. She said, "Bring Jefferies." *Id.* at 86. He then asked if he could come down to her cell and look at her naked through the window, and she agreed. She testified that his request made her feel wanted and appreciated. When Mendez got to the cell, Ms. Graham, who was naked, stood up and let him look at her. Because the cell was completely dark, Mendez shined his flashlight through the cell-door window to see her. The encounter lasted 30 seconds or less.

In the early morning of October 9, 2009, either Jefferies or Mendez called Chris Haywood, a guard stationed in the control tower, to ask that Ms. Graham's cell be opened. When she heard her cell door slide open, she got up and found Mendez standing in the doorway with Jefferies behind him. She was wearing just her T-shirt. Mendez took it off and Ms. Graham kissed Jefferies. She testified that it was then "back and forth" between the two men, and both had their hands on her. *Id.* at 92–93.

Jefferies began to have intercourse with Ms. Graham while she simultaneously performed oral sex on Mendez. The two men then switched positions, although Mendez was able to penetrate her only briefly. Mendez then dropped his radio. She stood up at least partially, but Mendez, still trying to have sex with her, pushed her head back down toward Jefferies, saying, "Bend over, bitch," and "Shhh." *Id.* at 96. When, however, she

heard another female inmate move and a coughing noise, Jefferies and Mendez fastened their pants and left the cell.

Haywood had become suspicious. When Jefferies and Mendez returned, he asked why they had been in the cell so long. They told him that Ms. Graham was a heavy sleeper, and that they had tried to wake her for a welfare check but could not.

Later that day another female inmate sent Major William Warner, the assistant jail administrator, a note stating that there was something going on between Ms. Graham and two officers. Warner questioned Ms. Graham, Mendez, and Jefferies. All stated that Jefferies and Mendez had entered the cell only to check on her.

During a search of Ms. Graham's cell three days later, officers found the above-quoted note that she had written to Jefferies. She stated that it was just to herself. On October 23 she was again placed in solitary confinement for a new disciplinary offense. After being there three days, she asked to speak to Warner. She told him that she had lied about the note found in her cell and that she had had sex with Mendez and Jefferies. She said that the sex was consensual. The jail administrator called the Oklahoma State Bureau of Investigation (OSBI) to investigate. When OSBI agent Michael Dean conducted a recorded interview, he asked her if the sex was consensual; she responded, "With Jefferies. I didn't really want Mendez there." *Id.* at 323–24. When asked if she was forced or given any promises, she said no. She said that the reason she came forward was to "get it off [her] chest" because she felt guilty. *Id.* at 322–23. She later testified in her deposition in this case that she thought that what happened was wrong and that she

felt she was "[s]upposed to be protected," but that she would not have had the same concerns about the sexual acts if she had been free. *Id.* at 106–07. She also stated that she felt her "rights" were taken from her when she was incarcerated and that she had no "control over it." *Id.* at 178.

Mendez and Jefferies were terminated immediately after admitting to having sex with Ms. Graham. She was transferred to another detention facility in early November 2009. While there, she told a psychologist that she had been raped by two jailers. She also stated that she was having trouble sleeping, that she was anxious, and that she felt that she was "shaking inside now all the time." *Id.* at 182. She was given medication for anxiety and depression. Ms. Graham had a history of bipolar disorder and sexual abuse. But there is no indication that either Jefferies or Mendez was aware of or had reason to be aware of her mental-health issues.

On September 24, 2010, Ms. Graham filed this suit. Her amended complaint alleged two claims under 42 U.S.C. § 1983: (1) a claim against Mendez and Jefferies for violations of the Eighth and Fourteenth Amendments and (2) a claim against the Sheriff of Logan County for failure to discipline, supervise, and train Jefferies and Mendez. One might also read the complaint to allege Oklahoma tort claims. The district court granted the defendants' motion for summary judgment on the § 1983 claims, holding that "in light of the consensual sexual activity at issue in this case," there was no Eighth Amendment violation. Aplt. App. at 57. The court also dismissed without prejudice any state-law claims, declining to exercise supplemental jurisdiction over the claims once all

6

federal claims had been dismissed.  Ms. Graham appeals, arguing that (1) her consent is a question of fact that must be decided by a jury, and (2) consent is not a valid defense to her claims.  We disagree and affirm.

## II.    DISCUSSION

The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII. Sexual abuse of an inmate by an officer violates the Eighth Amendment.  *See Giron v. Corrs. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999).  "Like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Id.* (brackets and internal quotation marks omitted).

Sexual abuse of a prisoner by a guard is generally analyzed as an excessive-force claim.  *See id.* at 1288–90.  "Ordinarily, an excessive force claim involves two prongs: (1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind."  *Id.* at 1289 (brackets and internal quotation marks omitted).

The subjective prong turns on whether the officer acted maliciously and sadistically.  Particularly relevant to this case, "[w]here no legitimate penological purpose can be inferred from a prison employee's alleged conduct, including but not limited to sexual abuse or rape, the conduct itself constitutes sufficient evidence that force was used

7

'maliciously and sadistically for the very purpose of causing harm.'" *Giron*, 191 F.3d at 1290 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Thus, when a prisoner alleges rape by a prison guard, the prisoner need prove only that the guard forced sex in order to show an Eighth Amendment violation. *See id.*

As for the objective prong, it does not require that a prisoner show a "significant injury" to pursue an Eighth Amendment claim. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotation marks omitted). Instead, the inquiry centers on the "nature of the force" used. *Id.* at 39. Although the extent of the injury suffered may be instructive in determining the amount of force used, a minor injury can still support an Eighth Amendment claim if the force used was "nontrivial and was applied maliciously and sadistically to cause harm." *Id.* (ellipsis and internal quotation marks omitted).

Defendants are entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard has been satisfied here because there is no genuine dispute that Jefferies and Mendez did not force Ms. Graham to have sex, making all other issues irrelevant.

Ms. Graham does not contest that she had participated in sexual conversations with Jefferies for an extended period before the acts in question occurred. She admits that she flashed Jefferies and wrote him notes that made clear that she wanted to have sexual intercourse with him. She admits to talking to Mendez about her fantasies, and that she told him to "[b]ring Jefferies" so that they could have a threesome. Aplee.

8

App. at 86. She admits to allowing Mendez to look at her naked and that doing so made her feel wanted and appreciated. She did nothing to indicate lack of consent when the guards entered her cell, when they removed her clothing, or when they touched her. She never told either of them that she did not want to have sex. She has stated repeatedly and consistently that almost all the sexual acts that occurred were consensual. Although she has said that she did not want to have sex with Mendez and that Mendez pushed her head down just before the encounter ended, she has not suggested that she indicated any reluctance to Jefferies or Mendez. And the argument section of her opening brief does not even mention that Mendez pushed her head down, much less present an argument regarding the significance of that act. (The brief mentions that act only in the Statement of Facts when it quotes a paragraph from the district court's summary-judgment order describing all the events in the cell.) We therefore do not consider that act in our analysis, although it might otherwise support a partial reversal and remand. *See Rieck v. Jensen*, 651 F.3d 1188, 1191 n.1 (10th Cir. 2011) ("[A]n argument is not preserved by merely alluding to it in a statement of facts."); *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (declining to address argument that was "not adequately developed").

Similarly, Ms. Graham's opening brief mentions her history of sexual abuse and mental illness but never explains how her mental-health issues would negate her consent or how they are relevant when Jefferies and Mendez had no knowledge of them. *Cf.* Model Penal Code § 213.1(2)(b) (1980) (gross sexual imposition occurs when the

9

perpetrator "knows that [the victim] suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct"); 2 Wayne R. LaFave, Substantive Criminal Law § 17.4(b) (2003) (most states have statutes criminalizing sex with a woman who is mentally disabled, although the required extent of disability and perpetrator's knowledge of the disability vary). We therefore do not explore these interesting issues. *See Perry*, 199 F.3d at 1141 n.13.

The other possible influence on Ms. Graham's consent was Jefferies' having given her a candy bar and a blanket on separate occasions. But these two favors cannot undermine the other overwhelming evidence of consent, particularly when she did not testify that the favors influenced her.

Unsurprisingly then, Ms. Graham's focus on appeal is not on whether she consented as a factual matter but on whether a prisoner can *legally* consent to sex with one of her custodians. She argues that under "evolving standards of decency" even consensual intercourse with a prisoner is cruel and unusual punishment. Aplt. Br. at 13 (internal quotation marks omitted). We decline to go so far.

To begin with, we reject Ms. Graham's contention that the matter is settled in this circuit. She cites *Lobozzo v. Colorado Department of Corrections*, 429 F. App'x 707, 711 (10th Cir. 2011), as establishing that sex between a prisoner and a guard can never be consensual. But unpublished opinions are not binding precedent, and we read our opinion as saying at most that the parties agreed that consent was not a defense, a moot point since the defendants prevailed anyway. Thus, it is a matter of first impression in

10

this circuit whether consent can be a defense to an Eighth Amendment claim based on sexual acts.

Other courts are divided in their approach to consensual sexual intercourse between guards and inmates. The Sixth and Eighth Circuits have ruled that consensual sexual intercourse does not rise to the level of an Eighth Amendment violation. *See Hall v. Beavin*, No. 98-3803, 1999 WL 1045694 (6th Cir. Nov. 8, 1999); *Freitas v. Ault*, 109 F.3d 1335, 1339 (8th Cir. 1997). *Hall* simply asserted the proposition. *See Hall*, 1999 WL 1045694, at *1. As for *Freitas*, it focused on the objective component of the excessive-force test, which it labeled "pain" rather than harm or injury. *Freitas*, 109 F.3d at 1339 (internal quotation marks omitted). The court concluded, "Without deciding at what point unwelcome sexual advances become serious enough to constitute 'pain,' we hold that, at the very least, welcome and voluntary sexual interactions, no matter how inappropriate, cannot as matter of law constitute 'pain' as contemplated by the Eighth Amendment." *Id.* (This focus on objective pain may not be consistent with the Supreme Court's more recent emphasis on force, rather than injury or harm. *See Wilkins*, 559 U.S. at 37–38 (2010).)

Some district courts have taken the opposite approach, holding that a prison guard has no consent defense in an Eighth Amendment civil-rights case alleging sexual relations. *See Cash v. Cnty. of Erie*, No. 04-CV-0182-JTC (JJM), 2009 WL 3199558, at *2 (W.D.N.Y. Sept. 30, 2009) ("Because plaintiff was incarcerated, she lacked the ability to consent to engage in sexual intercourse with [defendant guard] as a matter of law.");

11

*Carrigan v. Davis*, 70 F. Supp. 2d 448, 461 (D. Del. 1999). The *Carrigan* court relied on

Delaware law—which prohibits all sexual contact between guards and prisoners,

regardless of consent—as an indicator of "contemporary standards of decency."

*Carrigan*, 70 F. Supp. 2d at 453. It stated:

> Because vaginal intercourse and/or fellatio between inmates and prison
> guards serves no legitimate penalogical purpose, is illegal and thus,
> contrary to the goals of law enforcement, the Court concludes, as a matter
> of law, that such conduct by a prison guard in a Delaware correction facility
> is per se sufficient to establish that the guard acted with a culpable mind.

*Id.* 454–55.

> More recently, the Ninth Circuit adopted a middle ground in *Wood v. Beauclair*,

692 F.3d 1041 (9th Cir. 2012). The court wrote:

> While we understand the reasons behind a per se rule that would make
> prisoners incapable of legally consenting to sexual relationships with prison
> officials, we are concerned about the implications of removing consent as a
> defense for Eighth Amendment claims. On the other hand, allowing
> consent as a defense may permit courts to ignore the power dynamics
> between a prisoner and a guard and to characterize the relationship as
> consensual when coercion is clearly involved.

*Id.* at 1048. The court elected to create a rebuttable presumption of nonconsent. *See id.*

at 1049. The state official can rebut the presumption by showing that the sexual

interaction "involved no coercive factors." *Id.* The court declined to provide an

extensive list of factors but remarked that in addition to words or behavior showing

opposition, coercive factors could include "favors, privileges, or any type of exchange for

sex." *Id.*

In short, there is no consensus in the federal courts on whether, or to what extent, consent is a defense to an Eighth Amendment claim based on sexual contact with a prisoner. As a matter of public policy, Ms. Graham's position has force. We cannot imagine a situation in which sexual activity between a prison official and a prisoner would be anything other than highly inappropriate. But not all misbehavior by public officials, even egregious misbehavior, violates the Constitution. The Supreme Court has warned against constitutionalizing (or unconstitutionalizing, if that can be a word) tortious conduct by government agents. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation."); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles."). Circuit courts have said the same about criminal misconduct. *See, e.g.*, *Draw v. City of Lincoln Park*, 491 F.3d 550, 553, 555–56 (6th Cir. 2007) (police-officer conduct in facilitating drag race did not rise to level of constitutional violation even though officers pleaded no-contest to criminal charges of neglect of duty); *Fee v. Herndon*, 900 F.2d 804, 808 (5th Cir. 1990) ("[T]he Constitution is not a criminal or civil code to be invoked invariably for the crimes or torts of state educators who act in contravention of the very laws designed to thwart abusive disciplinarians.").

13

Absent contrary guidance from the Supreme Court, we think it proper to treat sexual abuse of prisoners as a species of excessive-force claim, requiring at least some form of coercion (not necessarily physical) by the prisoner's custodians. We agree with the Ninth Circuit that "[t]he power dynamics between prisoners and guards make it difficult to discern consent from coercion." *Wood*, 692 F.3d at 1047. But there is no difficulty presented by the facts relied on by Ms. Graham in this case. Even were we to adopt the same presumption as the Ninth Circuit, the presumption against consent would be overcome by the overwhelming evidence of consent. Ms. Graham's rights under the Eighth Amendment were not violated.

## III.   CONCLUSION

We AFFIRM the district court's grant of summary judgment for the defendants.

14