**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PRISON LEGAL NEWS, a project of:
other Human Rights Defense Center,
*Plaintiff-Appellee*,

v.

CHARLES L. RYAN, in his official
capacity as Director of the Arizona
Department of Corrections and in his
individual capacity; GAIL
RITTENHOUSE, in her official
capacity as Division Director,
Support Services of the Arizona
Department of Corrections and in her
individual capacity; JEFF HOOD, in
his official capacity as Deputy
Director of the Arizona Department
of Corrections and in his individual
capacity; ALF OLSON, in his official
capacity as an employee of the
Office of Publication Review of the
Arizona Department of Corrections
and in his individual capacity; JAMES
RIGGS, in his official capacity as an
employee of the Office of
Publication Review of the Arizona
Department of Corrections and his
individual capacity; JAMIE GUZMAN,
in her official capacity as an

No. 19-17449

D.C. No.
2:15-cv-02245-
ROS

OPINION

employee of the Office of
Publication Review of the Arizona
Department of Corrections,
                    *Defendants-Appellants*,


            and

UNKNOWN PARTIES, named as: Does
1 to 20 (inclusive),
                    *Defendant.*

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted May 12, 2021
San Francisco, California

Filed July 8, 2022

Before:  Michael Daly Hawkins, Sidney R. Thomas, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Miller

# SUMMARY[*]

## Prisoner Civil Rights

The panel (1) affirmed in part and reversed in part the district court's summary judgment in favor of the publisher of *Prison Legal News*; and (2) vacated in part the district court's permanent injunction requiring distribution of certain previously censored issues of *Prison Legal News'* monthly journal in an action brought pursuant to 42 U.S.C. § 1983 challenging, on its face and as-applied, Arizona Department of Corrections' Order 914, under which the Department may prohibit inmates from receiving mail containing "sexually explicit material."

The panel first considered PLN's facial challenge to the order. The panel held that the penological interests in jail security and rehabilitation were legitimate and the order was neutral in the sense relevant to the analysis set forth in *Turner v. Safley*, 482 U.S. 78 (1987). The panel held that properly construed, the order banned only content that graphically depicted nudity or sex acts. And so interpreted, the order was rationally related to its purposes of protecting the safety of guards and reducing sexual harassment. Because PLN failed to point to viable alternatives, the order's prohibition on sexually explicit materials was not an exaggerated response to prison concerns.

The panel determined, however, that one aspect of the order swept more broadly than could be explained by the Department's penological objectives: section 1.2.17's ban

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

on content that "may" cause sexual arousal or be suggestive of sex. That provision was not rationally related to the Department's interests; there was no apparent connection between restricting all content that "may" cause sexual arousal or be suggestive of sex—in the subjective judgment of the prison employee reviewing incoming mail—and the penological interests at stake. Nor did any record evidence support such a connection.

Turning to PLN's as-applied challenges, the panel held that most of the Department's redactions of the *Prison Legal News* issues satisfied *Turner* and abided by the First Amendment. The panel reversed the grant of summary judgment on PLN's as-applied challenges, except with respect to the April 2017 and May 2017 issues. The panel agreed with the district court that the April 2017 issue did not contain sexually explicit material within the meaning of the order. As to one portion of the May 2017 issue, the panel vacated the district court's judgment and remanded for the Department to clarify the basis for the redaction, and if necessary, for the district court to consider whether alternate bases for the redaction applied.

## COUNSEL

Michael E. Gottfried (argued) and Daniel P. Schaack, Assistant Attorneys General; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellants.

Lisa Ells (argued), Sanford Jay Rosen, and Amy Xu, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California; Daniel Marshall, Human Rights Defense Center, Lake Worth, Florida; David J. Bodney and Michael A.

DiGiacomo, Ballard Spahr LLP, Phoenix, Arizona; for Plaintiff-Appellee.

**OPINION**

MILLER, Circuit Judge:

In 2010, the Arizona Department of Corrections issued Order 914, under which the Department may prohibit inmates from receiving mail containing "sexually explicit material." The Department invoked the order to redact several issues of *Prison Legal News*, a monthly journal for prison inmates that covers developments in the criminal justice system. The publisher of *Prison Legal News* sued the Department under 42 U.S.C. § 1983, arguing that Order 914 violates the First Amendment on its face and as applied to *Prison Legal News*. The district court granted summary judgment to the publisher and entered a permanent injunction requiring the Department to amend its order and allow distribution of the issues that had been censored. The Department appeals. We conclude that most of the order's relevant prohibitions are facially constitutional under the First Amendment and that most of the as-applied challenges lack merit. We reverse in part, affirm in part, vacate the permanent injunction in part, and remand for further proceedings.

I

Before 2010, the Department imposed few restrictions on inmates' receipt of sexually oriented writings and images. But according to the Department, prison staff—and female employees in particular—complained that inmates often used sexually explicit images to harass them. The presence of such materials, the Department says, "created a hostile

environment for inmates, staff, and volunteers." The Department also says that such materials undermined its rehabilitative goals for inmates—especially those convicted of sex crimes—by frustrating its efforts to impose upon them "society's norms and respect for rules and boundaries." To address these concerns, the Department issued Order 914. The Department has periodically amended the order, but except as otherwise noted, this case involves the version effective April 7, 2017.

Order 914 prohibits inmates from sending, receiving, or possessing "sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility." *See generally Jones v. Slade*, 23 F.4th 1124, 1130–31 (9th Cir. 2022) (describing Order 914). It defines "sexually explicit material" as:

> Any publication, drawing, photograph, film, negative, motion picture, figure, object, novelty device, recording, transcription, or any book, leaflet, catalog, pamphlet, magazine, booklet or other item, the cover or contents of which pictorially or textually depicts nudity of either gender, or homosexual, heterosexual, or auto-erotic sex acts including fellatio, cunnilingus, masturbation, sadism, sado-masochism, bondage, bestiality, excretory functions, sexual activity involving children, an unwilling participant, or the participant who is the subject of coercion.

The order includes a non-exhaustive list of examples of prohibited content, including "instructions regarding the function of locks and/or security devices," "instructions for

the brewing of alcoholic beverages," "instructions regarding the sale, manufacture, concealment, or construction of ammunition, guns, rifles, bombs, [or] explosives," and instructions on "methods of escape and/or eluding capture." As relevant here, the list also includes publications that "depict nudity of either gender" or "depict . . . [p]hysical contact by another person with a person's unclothed genitals, pubic area, buttocks or, if such person is a female, breast." Another item in the list, section 1.2.17, imposes a broader prohibition that covers:

> Content in publications, photographs, drawings, or in any type of image or text, that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire, and/or depicts sexual representations of inmates, correctional personnel, law enforcement, military, medical/mental health staff, programming staff, teachers or clergy.

But the order exempts any publication containing otherwise-prohibited material if it is "commonly considered to constitute a well-known and widely recognized religious . . . or literary work," as well any publication that quotes from judicial decisions "if the unauthorized content is reasonably necessary to understand the fundamental legal issue."

The Department claims that "[s]ince those regulations were adopted, staff ha[ve] reported that they generally feel more comfortable, especially female staff, because they are

not exposed to unwanted images and text of graphic, explicit sexual content."

Inmates at more than 3,000 prisons, including those operated by the Department, subscribe to *Prison Legal News*. Before 2014, the Department allowed the circulation of more than 90 issues of *Prison Legal News* without incident. But that year, the Department refused to deliver several issues because, it said, they contained sexually explicit material. The Department later reversed that decision except with respect to one article in one issue. In 2017, the Department redacted articles in three other issues for similar reasons.

Prison Legal News (PLN), publisher of the eponymous journal, brought this action against Department officers and directors in their official and individual capacities, arguing that Order 914 violates the First Amendment both on its face and as applied to *Prison Legal News*. On cross-motions for summary judgment, the district court held that the order "is not rationally related to [the Department's] stated goals of rehabilitation, reduction of sexual harassment, and prison security" and is therefore unconstitutional on its face. The court also held that the Department had acted unconstitutionally in censoring the four issues.

Thereafter, the district court granted a permanent injunction requiring the Department to amend Order 914 "to establish bright-line rules that narrowly define prohibited content in a manner consistent with the First Amendment; limit the discretion available to [the Department's] employees and agents; and ensure consistency in the exclusion of sexually explicit material." It also required the Department to "distribute complete copies of the previously censored October 2014, April 2017, May 2017, and June 2017 issues of *Prison Legal News*" to inmate subscribers.

The Department appeals. We review the district court's grant of summary judgment de novo. *See Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

## II

The starting point for our analysis is *Turner v. Safley*, 482 U.S. 78 (1987), in which the Supreme Court established the framework by which we review the constitutionality of prison rules that impinge on inmates' constitutional rights. That framework is highly deferential, and it often requires us to uphold rules that, in contexts not involving prisons, would plainly violate the First Amendment.

In *Turner*, as in many previous cases, the Court recognized that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." 482 U.S. at 84. Instead, an inmate retains rights "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 95 (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). At the same time, the Court recognized that the administration of prisons is a "difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government," and therefore "separation of powers concerns counsel a policy of judicial restraint." *Id.* at 84–85.

Based on those considerations, the Court set forth a deferential, four-factor test for evaluating whether prison regulations are constitutional. *Turner*, 482 U.S. at 89–91; *see Beard v. Banks*, 548 U.S. 521, 529 (2006). We have articulated those factors as follows:

(1) [W]hether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an "exaggerated response" to the jail's concerns.

*Mauro v. Arpaio*, 188 F.3d 1054, 1058–59 (9th Cir. 1999) (en banc).

In the years since *Turner*, we and other courts of appeals have applied its test to uphold the constitutionality of prison rules that restrict the ingress and possession of sexually explicit materials. *See, e.g.*, *Mauro*, 188 F.3d at 1057 (upholding ban on materials that show "frontal nudity"); *Bahrampour v. Lampert*, 356 F.3d 969, 972 (9th Cir. 2004) (upholding ban on mail containing sexually explicit material, including "portrayals of certain actual or simulated sexual acts"); *Frost v. Symington*, 197 F.3d 348, 357–58 (9th Cir. 1999) (upholding ban on explicit depictions of certain sexual acts); *Amatel v. Reno*, 156 F.3d 192, 194 (D.C. Cir. 1998) (upholding ban on distribution of material that is "sexually explicit or features nudity"). But even in the context of regulating incoming inmate mail, *Turner* does not make the First Amendment "toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). Accordingly, we have held that restrictions on certain classes of incoming mail violate the First Amendment when they bear no rational connection, or are an exaggerated response, to legitimate penological interests. *See Prison Legal News v. Lehman*,

397 F.3d 692, 699–701 (9th Cir. 2005); *Morrison v. Hall*, 261 F.3d 896, 898, 904–05 (9th Cir. 2001); *Prison Legal News v. Cook*, 238 F.3d 1145, 1149–51 (9th Cir. 2001); *Crofton v. Roe*, 170 F.3d 957, 959–61 (9th Cir. 1999).

## III

With those principles in mind, we consider PLN's facial challenge to Order 914. Ordinarily, a plaintiff seeking to prevail on a facial challenge must show "'that no set of circumstances exists under which [the regulation] would be valid,'" or—although the Supreme Court has acknowledged some uncertainty on this issue—that the regulation "lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and then quoting *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in the judgment)). In the First Amendment context, however, the Court has "recognize[d] 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep.'" *Id.* at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). When a plaintiff presents such a facial challenge to a prison regulation, we evaluate it using the *Turner* framework, just as we would if the challenge were to a specific application of the regulation. *Bahrampour*, 356 F.3d at 975.

## A

Before we can apply the *Turner* factors, we must construe the challenged order. *See United States v. Williams*, 553 U.S. 285, 293 (2008) ("[I]t is impossible to determine whether a statute reaches too far without first knowing what

the statute covers."). The parties present two questions about the order's scope.

First, does the order prohibit mere mentions of sex that have nothing "explicit" about them? PLN argues—and the district court agreed—that because the order broadly defines "sexually explicit material" as "[a]ny publication [that] pictorially or textually depicts nudity of either gender, or . . . sex acts," the order "effectively reads 'explicit' out of the policy" and authorizes the Department to restrict "any text that discusses sex or nudity in any context or level of detail." The Department disagrees, arguing that the order does not permit it to restrict the "mere mention of a sex act."

We think the Department has the better argument. As an initial matter, we agree with PLN and the district court that the meaning of "sexually explicit material" is governed by the order's express textual definition. *See Burgess v. United States*, 553 U.S. 124, 129–30 (2008). But in construing that definition, we cannot lose sight of the actual term it is defining. *See Borden v. United States*, 141 S. Ct. 1817, 1830 (2021); *Johnson v. United States*, 559 U.S. 133, 139–40 (2010). The interpretation that PLN advances would—as the district court recognized—read the word "explicit" out of the order. It makes more sense, in our view, for "explicit" to retain meaning and inform the order's scope. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019).

The requirement that the sexual material be "explicit" is confirmed by the operative verb in the definition: "depicts." That word typically connotes something more than a mere mention; it implies a level of description akin to that of a painting. *See Webster's Third New International Dictionary* 605 (1993) ("to form a likeness of by drawing or painting" or "to represent, portray, or delineate in other ways than in drawing or painting"); *accord Oxford English Dictionary*

(3d ed. 2009), https://www.oed.com/view/Entry/50277 ("To draw, figure, or represent in colours; to paint; also, in wider sense, to portray, delineate, figure anyhow;" "To represent or portray in words; to describe graphically;" or "To represent, as a painting or picture does."). Read in conjunction with "explicit," it indicates that the Department may restrict sexual content only to the extent that it describes or shows, in a sufficiently graphic manner, nudity or the sexual acts specified in the order. A mere mention of sex is not enough.

Our interpretation is confirmed by the many provisions of the order that mention particular sexual acts. The record shows that prisoners may view the order, but under the district court's reading, it appears that the order itself would have to be censored because of its references to sex. We will not construe the order to be self-prohibiting.

Second, does the order require the Department to make an individual determination that each piece of "sexually explicit material" is "detrimental to the safe, secure, and orderly operation of the facility" before restricting it? The district court construed that phrase in the sentence at issue—"inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility"—to modify only "content" and not "sexually explicit material." Under that reading, all sexually explicit material is proscribed, without any need for an individual determination that it is detrimental to the operation of the facility.

The Department maintains that the phrase modifies both terms. Therefore, it says, the order is analogous to the regulation at issue in *Thornburgh*, which allowed wardens to restrict incoming materials that the wardens determined to be "detrimental to the security, good order, or discipline of

the institution." 490 U.S. at 416–17 (quoting 28 C.F.R. §§ 540.70, 540.71(b) (1988)).

On this point, we conclude that the district court was correct. The interpretive principle that governs this situation is the nearest-reasonable-referent canon, which instructs that a "postpositive modifier normally applies only to the nearest reasonable referent." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012); *see Hall v. United States Dep't of Agric.*, 984 F.3d 825, 838 (9th Cir. 2020). Here, the nearest referent for the phrase "detrimental to the safe, secure, and orderly operation of the facility" is "content." It modifies only that term.

The Department invokes the series-qualifier canon, which teaches that "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 235 U.S. 345, 348 (1920)). But that canon does not apply here because "sexually explicit material or content" is not an "integrated clause" that "hangs together as a unified whole, referring to a single thing." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018); *see Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169–70 (2021). It would make little sense for "sexually explicit" to modify both "material" and "content"—so that the phrase might refer to one concept— because the illustrative list of banned content includes material that has nothing to do with sex, such as instructions on locks, weapons, and methods of escape. "Sexually explicit material" and other "content" detrimental to prison operations must therefore be distinct prohibitions.

In support of its reading, the Department also urges us to apply the canon of constitutional avoidance, under which, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). But that canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). We find no such ambiguity here.

## B

Having construed Order 914, we now apply *Turner*. With one exception, we conclude that the order is facially constitutional.

### 1

The first *Turner* factor is "whether there is a valid, rational connection between the [rule] and the legitimate governmental interest put forward to justify it." *Mauro*, 188 F.3d at 1058–59. This factor consists of three sub-requirements. First, "the governmental objective underlying the policy [must be] legitimate." *Id.* at 1059. Second, the rule must be "neutral." *Id.* And third, the rule must be "rationally related to [the government's] objective." *Id.* (quoting *Thornburgh*, 490 U.S. at 414).

No one disputes that the penological interests here are legitimate. *See Jones*, 23 F.4th at 1135. The order's stated purpose is "to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers." We have held that "[i]t is beyond question that both jail security and

rehabilitation are legitimate penological interests." *Mauro*, 188 F.3d at 1059. Nor is there any question that prison administrators have legitimate interests in "protecting the safety of guards" and "reducing sexual harassment." *Id.*

The parties also agree that the order is "neutral" in the sense relevant to the *Turner* analysis. Outside of the prison context, First Amendment law distinguishes between regulations of speech that are "content neutral" and those that are "content based," with the latter category comprising regulations that "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Although the order is not "content neutral" in that sense, neutrality under *Turner* "is not the 'content neutrality' we demand in other areas of First Amendment jurisprudence." *Jones*, 23 F.4th at 1136; *accord Amatel*, 156 F.3d at 197. Under *Turner*, a regulation is "neutral" as long as it applies to specific types of materials "solely on the basis of the materials' potential effect on the prison's legitimate objectives." *Mauro*, 188 F.3d at 1059; *Bahrampour*, 356 F.3d at 976. The district court found the order to be neutral because it furthers "an important or substantial governmental interest unrelated to the suppression of expression." We agree.

The dispute here concerns the third sub-factor: whether the order is rationally related to the Department's objectives. The district court identified no such relationship, so it deemed unconstitutional all of the order's prohibitions on sexual content. In reaching that conclusion, the district court relied heavily on its interpretation of the order as covering non-explicit material that merely mentions sex. As we have explained, however, the order is narrower than that. Properly

construed, it bans only content that graphically depicts nudity or sex acts. And so interpreted, the order is rationally related to its purposes.

The rational-relationship inquiry is highly deferential. To invalidate a regulation, a court must determine that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. Conversely, a court may uphold a regulation even if prison officials are unable to "prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188 F.3d at 1060. Nor must the officials be able to demonstrate that the policy in fact advances the jail's interests. Rather, it is enough that officials "might reasonably have thought that the policy" would do so. *Id.*

Our precedent establishes that it is rational for prison officials to restrict sexually explicit materials to mitigate prison violence and advance related interests. In *Mauro*, for example, we upheld as consistent with the First Amendment a prison ban on publications that displayed frontal nudity. 188 F.3d at 1058–63. In so holding, we recognized that "[t]he relationship between the jail's policy of prohibiting the possession of sexually explicit materials and the goals of preventing sexual harassment of the female officers, inmate rehabilitation and maintenance of jail security is not so 'remote as to render the policy arbitrary or irrational.'" *Id.* at 1060 (footnote omitted) (quoting *Turner*, 482 U.S. at 89–90); *accord Giano v. Senkowski*, 54 F.3d 1050, 1053–56 (2d Cir. 1995). Similarly, in *Bahrampour*, we upheld a prison ban on "sexually explicit materials," and we credited evidence showing "a rational connection between the availability of sexually explicit materials and harmful inmate

behavior such as rape," "other forms of sexual predation," and "aggressive and inappropriate tendencies." *Bahrampour*, 356 F.3d at 972, 976. Because our precedents endorse the precise relationship at issue here, we need not look further. So long as the content at issue meets the narrow definition of "sexually explicit," prohibiting it can be rationally related to the Department's objectives.

PLN emphasizes that Order 914 reaches written material, not just pictures. We note that it may be uncommon for textual material to be covered by our narrow construction of the order, but we nonetheless conclude that the Department's rational interests can extend to restricting those texts that are, in fact, "sexually explicit."

One aspect of the order, however, goes too far: section 1.2.17's ban on content "that may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behaviors, or that depicts sexually suggestive settings, poses or attire." That provision is not rationally related to the Department's interests. There is no apparent connection between restricting all content that "may" cause sexual arousal or be suggestive of sex—in the subjective judgment of the prison employee reviewing incoming mail—and the penological interests at stake. Nor does any record evidence support such a connection. All the Department offers is a declaration saying that the presence of sexually *explicit* materials undermines its goals. It also does not contend that all inmate sexual arousal, or all materials that reference sex, threaten prison interests. Section 1.2.17 therefore "sweeps much more broadly than can be explained by [the Department's] penological objectives." *Turner*, 482 U.S. at 98–99. Indeed, although our analysis of this facial challenge does not depend on how the

order has been applied in practice, we note that section 1.2.17 alone appears to be responsible for cases PLN identifies in which the Department has censored medical information as well as mundane images displaying fully clothed women doing nothing that could be considered suggestive—censorship that the Department makes no effort to defend.

The Department has cited no appellate case, and we are aware of none, in which a court has upheld a comparable ban for a general prison population. We express no view as to whether such a ban might be permissible if it applied only to penal facilities that predominantly house sex offenders, which present unique penological challenges. *See Beard*, 548 U.S. at 524–26; *Waterman v. Farmer*, 183 F.3d 208, 215 (3d Cir. 1999).

Because section 1.2.17 does not satisfy *Turner*'s first factor, it violates the First Amendment, and we need not consider the remaining factors. *Hrdlicka v. Reniff*, 631 F.3d 1044, 1051 (9th Cir. 2011). In crafting a remedy, we must sever unconstitutional provisions when it is possible to do so. *United States v. Rundo*, 990 F.3d 709, 720 (9th Cir. 2021) (per curiam). We therefore will "limit the solution to the problem," *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350 (2020) (quoting *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010)), and sever the portion of section 1.2.17 covering material that "may, could reasonably be anticipated to, could reasonably result in, is or appears to be intended to cause or encourage sexual excitement or arousal or hostile behavior, or that depicts sexually suggestive settings, poses or attire."

2

For those provisions other than section 1.2.17, our analysis must proceed. The district court did not address *Turner* factors two through four, but because the relevant facts are undisputed and those factors raise "purely legal" issues that have been fully briefed by the parties, we elect to address them in the first instance rather than delay their resolution. *Planned Parenthood of Greater Wash. & N. Idaho v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110–11 (9th Cir. 2020). We hold that the remaining factors all weigh in the Department's favor.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. The parties dispute whether the "right" should be viewed from PLN's perspective (its right to communicate with its readers) or from the inmates' perspective (their right to receive sexually explicit materials). In arguing for the former, PLN relies on our decision in *Hrdlicka*, in which we held that a publisher had established a genuine issue of material fact on the second *Turner* factor by showing that the challenged regulation left the publisher without the ability to reach inmates. 631 F.3d at 1053–54. That approach appears to be inconsistent with *Turner*, in which the Court referred to "alternative means . . . that remain open to prison *inmates*," 482 U.S. at 90 (emphasis added), and *Thornburgh*, in which the Court concluded that sufficient alternatives were available because the regulations permitted "a broad range of publications to be sent, received, and read" by inmates. 490 U.S. at 417–18; *cf. id.* at 410 n.9 (rejecting "any attempt to forge separate standards for cases implicating the rights of outsiders").

We need not resolve that dispute because even assuming that PLN is correct that the right should be viewed from its

perspective, this factor still favors the Department. The parties agree that the Department has allowed inmates to access essentially all *Prison Legal News* content since the Department issued the order in 2010. The as-applied challenges, after all, involve relatively minor redactions from just a few articles in four issues of *Prison Legal News*. It therefore seems clear for present purposes that the order leaves PLN with ample alternative means for PLN, in its words, "to provide its subscribers with information that is critical to their understanding of their rights while behind bars."

And viewing the right from the inmates' perspective, PLN concedes that the Department allows inmates to access personal letters, television shows, prison library books, and other *Prison Legal News* articles that contain sexually explicit content. The order's exceptions for legal publications and well-known religious or literary works— which the Department added in 2017—should provide additional alternatives for access, even if the Department has not yet invoked those exceptions.

### 3

The third *Turner* factor is "the impact that accommodation of the asserted constitutional right would have on prison personnel, other inmates, and the allocation of prison resources"; here, "the impact of allowing inmates unrestricted access to sexually explicit materials." *Mauro*, 188 F.3d at 1061. In evaluating this factor, we consider the effect of allowing inmates to access the entire class of relevant publications. *See id.* at 1061–62; *Thornburgh*, 490 U.S. at 418.

This factor also supports the Department. In *Mauro*, we held that allowing inmates to access images of nudity would

significantly undermine prison interests because it "could lead to the bartering of sexually explicit materials and anatomical comparisons which could in turn lead to fights between inmates" and expose officers to sexual harassment. 188 F.3d at 1061–62. That conclusion is equally valid here. *See Thornburgh*, 490 U.S. at 418; *Frost*, 197 F.3d at 358.

4

The fourth and final *Turner* factor is "whether the policy is an exaggerated response to the jail's concerns." *Mauro*, 188 F.3d at 1062. "The burden is on the [plaintiff] challenging the regulation . . . to show that there are obvious, easy alternatives to the regulation" that would fully accommodate the inmate's rights at a de minimis cost to valid penological interests. *Id*. *Turner* does not require the Department to use the "least-restrictive-alternative" means of achieving its goal. *Overton v. Bazzetta*, 539 U.S. 126, 136 (2003).

PLN proffers two alternatives that the Department might employ, but both of them are lacking. First, PLN suggests that the Department confine itself to restricting only "obscene" material. By "obscene," PLN refers to the obscenity standard from *Miller v. California*, 413 U.S. 15 (1973). But obscene speech is not protected by the First Amendment and may be prohibited even for non-prisoners, so it does not implicate *Turner*. *See Ramirez v. Pugh*, 379 F.3d 122, 129 n.2 (3d Cir. 2004). This "alternative" would therefore involve no prison-specific restriction at all.

Second, PLN suggests that the Department restrict only "salacious" material, which it describes as publications that are "promoted on the basis of sex, with [their] contents . . . plainly *intended* to cause arousal." We disagree that this alternative would impose a de minimis cost on valid

penological interests. Such a restriction would be far more limited than those that we upheld in *Mauro* and *Bahrampour*. And it would allow inmates to receive any type of lurid content so long as its publisher did not promote it based on its sexual nature.

Because PLN failed to point to a viable alternative, we conclude that the order's prohibition on sexually explicit materials "is not an exaggerated response to prison concerns." *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993). All four *Turner* factors therefore support the order's constitutionality. Except for the portion of section 1.2.17 addressed above, we uphold the order's prohibitions on sexual material in incoming inmate mail as consistent with the First Amendment.

IV

We turn next to PLN's as-applied challenges, which are also subject to the *Turner* framework. *Bahrampour*, 356 F.3d at 975. The Department asserts that our inquiry is limited to whether "the publications were covered by" the order. That is surely a necessary condition for upholding a restriction on a publication—if a publication is not covered by a prison policy, then presumably it does not relate to the interests the policy is meant to vindicate, at least as the prison has articulated them. But it is not sufficient by itself because *Turner* requires us to consider "whether applying the regulation to [the] speech . . . was rationally related to the legitimate penological interest asserted by the prison." *Hargis v. Foster*, 312 F.3d 404, 410 (9th Cir. 2002).

With at least one exception, we conclude that most of the Department's redactions of the *Prison Legal News* issues satisfy *Turner* and abide by the First Amendment.

## A

The Department redacted portions of one article from the October 2014 issue of *Prison Legal News*. That article describes the Tenth Circuit's decision in *Graham v. Sheriff of Logan Cty.*, 741 F.3d 1118 (10th Cir. 2013), in which the court held that an inmate could not bring an Eighth Amendment claim based on an incident in which she engaged in sexual activity with two prison guards. The redacted language summarizes and quotes portions of the opinion that describe—in graphic detail—the facts underlying the interactions. (We will leave the licentious passages in the decent obscurity of the *Federal Reporter, Third Series*.)

The redactions were rationally related to the Department's penological interests, including deterring the harassment of guards. Under *Turner*'s deferential standards, the connection to the Department's interests was not so "remote as to render the [application of the] policy arbitrary or irrational." *Mauro*, 188 F.3d at 1060 (footnote omitted) (quoting *Turner*, 482 U.S. at 89–90). That the depiction of sex was arguably academic in nature—because it came from a court opinion—does not defeat this connection.

PLN does not argue that prisoners have an enhanced right to receive materials that quote from court decisions, so we do not consider that question. *See Shaw v. Murphy*, 532 U.S. 223, 228, 231–32 (2001); *Lewis*, 518 U.S. at 350–51. Nor do we consider whether the Department would be required to admit this material under its exception for publications that directly quote from court decisions "if the unauthorized content is reasonably necessary to understand the fundamental legal issue." That exception is contained in the 2017 version of the order but was not in effect at the time the Department redacted this article.

The district court also found the redaction arbitrary and irrational because the Department admitted indistinguishable text in other issues of *Prison Legal News*. We agree that the other text is not meaningfully different because it likewise graphically depicts sexual interactions between guards and inmates. But while that would be a strong argument in a First Amendment case not involving prisons, the Supreme Court in *Thornburgh* rejected the argument that inconsistency in prison censorship is enough to establish a violation, reasoning that "greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications." 490 U.S. at 417 n.15; *see Jones*, 23 F.4th at 1138 ("Variations in the enforcement of a policy will not always rise to the level of inconsistent application."). So too here.

B

The April 2017 issue of *Prison Legal News* describes a New Mexico prison riot in which a group of convicts orchestrated an insurrection and then murdered dozens of fellow prisoners. At issue is one sentence redacted by the Department: "A dozen guards were taken hostage during the incident; some were beaten and raped." (The Department also redacted several other sentences in the article, but PLN does not challenge those redactions.)

Although this passage presents a close question, we agree with the district court that the redaction violates the First Amendment. Even when the censored sentence is considered in the context of the article as a whole, it does not describe the rape of prison guards in a sufficiently graphic manner to make the sentence "sexually explicit" within the meaning of the order. Rather, it is more akin to a mere mention of sexual violence, which the order does not allow the Department to restrict. Because the passage is not

covered by the order, redacting it cannot have been rationally related to the Department's legitimate penological goals.

C

The Department redacted portions of four articles in the May 2017 issue that describe instances of sexual and physical violence. It was rational for the Department to redact the portions of those articles graphically describing incidents of sexual violence perpetrated against minors. *See Bahrampour*, 356 F.3d at 972, 976; *see Dawson*, 986 F.2d at 259 & n.2.

The only redaction from the May 2017 issue that we question is the following one:

> The details of the assault on Demarest are chilling. At one o'clock in the morning, Brown awakened to the sound of glass shattering in the entryway of his home. He ran to Demarest's room to tell him someone was breaking in, but Vukovich was right behind him. Vukovich told Demarest to confirm his name and that he was a registered sex offender – for a crime for which he had served nine months, ten years earlier. "He told me to lay down on my bed and I said 'no.' He said 'get on your knees' and I said 'no.' He said, 'I am an avenging angel, I'm going to mete out justice for the people you hurt,'" Demarest stated. Then Vukovich hit him in the head with the hammer four or five times before Demarest lost consciousness.

It is unclear whether the district court determined that this passage was redacted for its sexual content, because the only

mention of sex relates to Demarest's status as a sex offender. We doubt that the Department redacted the passage for that reason, but if it did, Demarest's status as a sex offender does not qualify as a "depict[ion]" of sex. Because the Department has articulated other bases on which it could have redacted the article, we remand for the Department to clarify its position and, if necessary, for the district court to consider whether those alternate bases apply.

## D

The redactions from the June 2017 issue are from two articles, one condemning a light sentence given to a man who committed a heinous act of sexual violence on a minor, and another describing the exoneration of a defendant who had committed a similar act. The redacted passages describe the acts in question. Redacting these graphic descriptions of child sexual assault was rationally related to the Department's penological goals.

To the extent that *Turner* factors two through four apply to PLN's as-applied challenges, we incorporate our earlier analysis of them. We hold that, with the potential exception of the one redaction from the May 2017 issue noted above, all four *Turner* factors support the Department. PLN's as-applied challenges therefore fail.

\* \* \*

We reverse the district court's partial grant of summary judgment on PLN's facial First Amendment claims, except with respect to the portion of section 1.2.17 discussed above, as to which we affirm. We reverse the grant of summary judgment on PLN's as-applied challenges, except with respect to the April 2017 and May 2017 issues. As to those challenges, we affirm the district court's judgment on the

April 2017 redaction and vacate the district court's judgment on the May 2017 redaction and remand for further consideration. Accordingly, we vacate the district court's order entering a permanent injunction except as to the April 2017 redaction and remand for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED**.